Larry D. CALLOWAY,
Petitioner-Appellant,

v.

Frank BLACKBURN, Warden,
Respondent-Appellee.

No. 79–2607.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1980.

Judith Barry Wish, William T. Lake, Washington, D. C., for petitioner-appellant.

David J. Cortes, Asst. Dist. Atty., App. Div., J. Kevin McNary, New Orleans, La., for respondent-appellee.

Before CHARLES CLARK, RONEY, and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

The appellant, Larry D. Calloway, was convicted of first-degree murder and was sentenced to death on November 14, 1974, pursuant to the mandatory death penalty provision of Louisiana's first-degree murder statute. La.Rev.Stat.Ann. § 14:30 (1974). On July 2, 1976, the Supreme Court of the United States held that the mandatory

death penalty imposed by this statute violated the Eighth and Fourteenth Amendments of the United States Constitution. *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974, *reh. denied*, 429 U.S. 890, 97 S.Ct. 248, 50 L.Ed.2d 173 (1976). The Supreme Court of Louisiana subsequently affirmed the appellant's conviction, but remanded the case to the trial court for imposition of a life sentence in lieu of the death penalty. *State v. Calloway*, 343 So.2d 694 (La.1976). Thereafter, the appellant sought relief by applying to the Louisiana Supreme Court for a writ of habeas corpus. The writ was denied on September 1, 1978.

Having exhausted his state remedies, Calloway filed a petition for habeas corpus in the United States District Court for the Eastern District of Louisiana. The district court dismissed the petition on March 1, 1979. We then granted the appellant's motion for certificate of probable cause and his motion to proceed in forma pauperis on April 30, 1979. After careful consideration of the issues presented, we affirm the district court's denial of habeas corpus relief.

A brief review of the facts may be helpful in understanding the grounds upon which the appellant bases his assertion that he is entitled to relief. On April 2, 1974, William Mummaw, manager of the U-Oil-It Shop, No. 804, in New Orleans, was shot during the robbery of his store. Two witnesses, Mrs. Mummaw and Cliff Roberts, identified Calloway as the perpetrator from photographs and a lineup held at police headquarters. Calloway was indicted for first-degree murder and was brought to trial on October 24, 1974. At that time, the applicable Louisiana statute mandated the death penalty upon conviction of first-degree murder.

At the trial, Mrs. Mummaw testified during cross-examination that the perpetrator did not have a moustache. After the State rested its case, defense counsel sought to call two witnesses, Sheila Jones and Frank

Winfield, who purportedly would have testified that Calloway had worn a moustache before, during, and after the time of the murder. The assistant District Attorney objected to the testimony of these two witnesses because they had remained in the courtroom throughout the presentation of the state's case in violation of the sequestration rule. The trial court excluded their testimony, whereupon defense counsel called three other witnesses who testified that Calloway had a moustache at the time of the offense.

At the conclusion of the trail, and after the jury had been deliberating for approximately three hours, a juror, Lawless Honore, returned to the courtroom and informed the court that he was acquainted with Cliff Roberts, one of the state's principal witnesses.[1] Apparently Honore was a friend of Roberts' father-in-law. Honore stated that he and Roberts had been engaged in a business transaction about seven years earlier, but that they had not been in contact since that time. The trial judge questioned Honore as to what influence this acquaintance would have on his deliberation. Honore responded, "I don't think it would influence me," and, "I would come to the conclusion of what I think is right." The trial court then read Honore's entire testimony to the appellant in the presence of his attorney. After a discussion with his attorney, Calloway informed the court of his decision to allow the jury to continue deliberations. An hour later, he reversed his position and moved for a mistrial. The trial judge denied the motion.

The jury returned a verdict of guilty as charged, and Calloway was subsequently sentenced to death.

The appellant first challenges the imposition of the life sentence in lieu of the invalid death penalty. He argues that, since the first-degree murder statute under which he was convicted provided no alternative penalty, the unconstitutionality of the death

1. Another juror, Saul Aaron, reported that he knew a witness named Brown who had been present at the scene of the robbery and murder. The appellant seems to concede that this witness was relatively unimportant, and he does not complain of the Aaron-Brown relationship on appeal.

penalty provision rendered the entire statute void for lack of a prescribed punishment. He further asserts that, under the doctrine of separation of powers, the Supreme Court of Louisiana did not have the authority to inflict the life sentence penalty as a substitute for the death sentence. Thus, he claims that he was convicted of no crime and that his continued confinement is in violation of the Due Process Clause of the Fourteenth Amendment.

The appellant's main authority for this position is *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In *Weems*, a public official of the Philippine Islands was convicted of falsifying a public document in violation of a provision of the Philippine Penal Code. The statute in question set out three degrees of punishment, and Weems' sentence fell within the medium degree. The Supreme Court held that the penalty constituted cruel and unusual punishment, basically because it was not commensurate with the offense. The Court further stated that even if the minimum penalty had been imposed, the punishment would have been constitutionally impermissible. Hence, the Court concluded: "In other words, the fault is in the law; and as we are pointed to no other under which a sentence can be imposed, the judgment must be reversed, with directions to dismiss the proceedings." 217 U.S. at 382, 30 S.Ct. at 555, 54 L.Ed. at 805.

In contrast to the Court's disposition of *Weems* is the language employed in *Roberts v. Louisiana, supra*: "The judgment of the Supreme Court of Louisiana is reversed *insofar as it upheld the death sentence* imposed upon the [appellant], and the case is remanded for further proceedings not inconsistent with this opinion." 428 U.S. at

336, 96 S.Ct. at 3007, 49 L.Ed.2d at 983. (emphasis added). That statement contains no indication that the underlying conviction was invalid. *See also Selman v. Louisiana*, 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1212 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The appellant maintains that the Supreme Court properly remanded *Roberts*, but that the Louisiana Supreme Court's actions on remand exceeded that court's authority and transgressed the doctrine of separation of powers.

The approach taken by the Supreme Court of Louisiana in resentencing Roberts was followed in the instant case and in numerous similar cases which have arisen in the interim. That approach has been to impose as a sentence "the most severe constitutional penalty established by the legislature for criminal homicide at the time the offense was committed," such sentence being "imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years." *State v. Roberts*, 340 So.2d 263, 263 (La.1976). *Accord State v. Sheppard*, 350 So.2d 615 (La.1977); *State v. Williams*, 343 So.2d 1026 (La.) *cert. denied*, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); *State v. Jenkins*, 340 So.2d 157 (La.1976); *State v. Clark*, 340 So.2d 208 (La.1976). This punishment is lifted directly from the Louisiana second-degree murder statute which was in effect at the time of the commission of the offenses. La.Rev.Stat. Ann. § 14:30.1 (1974) (amended 1975). As such, it is a penalty actually prescribed by the state legislature for a lesser-included crime which, of necessity, is included in the first-degree murder offense for which the appellant was tried and convicted.[2] We

2. Former La.Rev.Stat.Ann. § 14:30 (1974) read as follows:

*First degree murder*
First degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or
(3) Where the offender has a specific intent to kill or to inflict great bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or
(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; [or]

perceive no separation of powers problem in this result. Indeed, the Louisiana Supreme Court seems to have taken great pains to honor the legislative will and to avoid any usurpation of the legislature's function.[3] Consequently, the district court's denial of habeas corpus relief on this ground was proper.

The appellant next contends that the exclusion of the testimony of Jones and Winfield violated his Sixth Amendment right to compulsory process of witnesses. It is undisputed that these witnesses violated the sequestration rule. While it is generally true that a witness should not be disqualified for this reason alone, "the right to exclude under *particular circumstances* may be supported as within the sound discretion of the trial court." *Holder v. United States*, 150 U.S. 91, 92, 14 S.Ct. 10, 10, 37 L.Ed. 1010, 1010 (1893) (emphasis added). This court's assessment of the situations which will justify exclusion is set out in *Braswell v. Wainwright*, 463 F.2d 1148 (5th Cir. 1972):

> (5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.
>
> For the purposes of Paragraph (2) herein, the term peace officer shall be defined and include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, district attorney, assistant district attorney or district attorney's investigator.
>
> Whoever commits the crime of first degree murder shall be punished by death.

Former Louisiana Rev.Stat.Ann. § 14:30.1 (1974) provided:

> *Second degree murder*
>
> Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
> (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill.
>
> Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation or suspension of sentence for a period of twenty years.

Upon the particular circumstances of each case the trial judge must weigh the exclusion of the witness against the defendant's right to obtain witnesses in his behalf. Where the defendant has been advised of his constitutional right and there has been a knowing intelligent waiver by the defendant, exclusion would be permissible. And perhaps the consent, procurement, or knowledge on the part of defendant or his counsel might rise to the level of a waiver and thus render exclusion proper. *Id.* at 1155.

The appellant does not deny that he and his counsel had knowledge of Jones' and Winfield's presence in the courtroom. Rather, he alleges that he had no intention of calling them to testify until Mrs. Mummaw, the State's last witness, disclosed on cross-examination that the perpetrator of the offense had no moustache. The veracity of this explanation is somewhat questionable in that Jones' name was on the defendant's witness list and she had been served

3. We note in passing that the Louisiana Supreme Court's solution to the invalid death penalty problem is analogous to the remedy adopted by the Supreme Court of North Carolina in the wake of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). *Woodson* invalidated the mandatory death penalty provision of the North Carolina first-degree murder statute, whereupon the state supreme court resentenced those persons convicted under the statute to life imprisonment. *See, e. g., State v. Harding*, 291 N.C. 223, 230 S.E.2d 397 (1976); *State v. Williams*, 290 N.C. 770, 228 S.E.2d 241 (1976); *State v. Thompson*, 290 N.C. 431, 226 S.E.2d 487 (1976). However, the actions of the North Carolina Supreme Court were expressly authorized by 1973 N.C.Sess.Laws c. 1201, § 7 (1974), which reads as follows:

> In the event it is determined by the North Carolina Supreme Court or the United States Supreme Court that a sentence of death may not be constitutionally imposed for any capital offense for which the death penalty is provided by this Act, the punishment for the offense shall be life imprisonment.

While we recognize that the North Carolina Supreme Court's authority to impose a substitute sentence is made clearer by virtue of this statute (indeed, it becomes an obligation), we do not feel that the absence of a similar enactment by the Louisiana legislature in any way affects the outcome of the instant case.

with a subpoena. In any event, defense counsel was allowed to call three witnesses who did testify that the appellant was wearing a moustache at the time of the robbery and murder. This is precisely the testimony the appellant sought to elicit from Jones and Winfield.[4] Therefore, he was not deprived of his right to obtain witnesses in his behalf, and he was not prejudiced by the exclusion of the testimony of Jones and Winfield.[5]

■ The final assignment of error deserves little comment. The appellant urges that the denial of his motion for a new trial deprived him of his Sixth Amendment right to a trial by an impartial jury. It is apparent that the relationship between juror Honore and witness Roberts was, at most, a casual one. The trial judge went to great length to assure that this relationship would have no effect on Honore's deliberations. In addition, the court fully advised the appellant of the situation and offered him the option of a mistrial, which offer he rejected. Under these circumstances, the trial court's denial of the subsequent motion for a mistrial does not afford him a basis for habeas corpus relief.

The judgment of the district court is AFFIRMED.

---

4. This case is thus distinguishable from cases such as *Braswell v. Wainwright, supra,* and *Barnard v. Henderson,* 514 F.2d 744 (5th Cir. 1975), where exclusion of the witness was held improper. In *Braswell,* the excluded witness was the defendant's sole corroborating witness to his claim of self-defense. Similarly, the witness who was precluded from testifying in *Barnard* was the only person available to testify that the defendant had not been present at the time and the place at which an altercation between the defendant and the victim was alleged to have occurred.

5. The appellant insists that he was prejudiced because the three witnesses who were allowed to testify were his girlfriend and her two sisters, and the jury would tend to disbelieve them. It should be noted, however, that these women were the same witnesses the appellant called in an effort to establish an alibi. Furthermore, if it is true that the moustache issue did not surface until midway through the trial, the Tucker sisters would seem to be no less credible than Jones and Winfield, since all three sisters were presumably sequestered during the examination of Mrs. Mummaw and would not have known the import of their testimony.